HULL-DOBBS CO. OF PUERTO RICO ET AL., Petitioners, *v.* SUPERIOR COURT OF PUERTO RICO, SAN JUAN PART, J. M. ALMODÓVAR ACEVEDO, JUDGE, Respondent; AMADO VEGA VEGA, Intervener.

No. 2298. Submitted October 15, 1958.—Decided April 9, 1959.

*Benicio Sánchez Castaño, Rafael Rivero Cervera,* and *Pascual Amado Rivera* for petitioners. *Luis A. Negrón López* for intervener.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

The whole question presented in this appeal narrows down to a determination of whether the subsequent purchasers of a mortgaged automobile, to which transactions the mortgagee did not consent, are bound to pay the value of the automobile upon default in payment of the obligation on maturity, notwithstanding the fact that both purchasers

placed at the disposal of the creditor the mortgaged thing to foreclose the mortgage credit.

On December 11, 1952, Florencio Vélez Maldonado purchased from Amado Vega a De Soto automobile, 1948 model, for the price of $1,200, of which he paid part in cash, binding himself to pay the balance of $1,032 on December 11, 1953. On that same date Vélez Maldonado issued in favor of the vendor, Amado Vega, a promissory note secured by a mortgage on the automobile in question to answer for the said sum of $1,032, default interest at 9 per centum per annum, and an additional credit of $250 for expenses, costs, and attorney's fees in the event of judicial claim.[1]

The purchaser and the vendor lived in the town of Sabana

---

[1] In the mortgage contract it was stipulated, among other things, the following:

"FOURTH: The mortgagor agrees that: First: He is in possession of and has an ownership title in the above-described property.—Second: He will take good care of the property hereby mortgaged; will pay promptly all taxes, *liens, and charges of any kind which may be assessed or which may encumber the mortgaged property during such term as the present mortgage is in full force and effect.*—Third: The mortgagee *may at a reasonable time enter the premises where such property may be found and inspect it properly.*—Fifth: In the event of default in any payment or in any installment of principal secured by the present mortgage; or if the mortgagor fails to comply with any of the obligations hereunder; or if the mortgagor is adjudged a bankrupt; or if any part of the property hereby mortgaged is attached or foreclosed by any person other than the mortgagee; or if the mortgagor dies or becomes disabled, *or in the event the mortgagee believes that he is not duly secured in either of those instances, the mortgagee may: First: Deem any indebtedness hereby secured to be due and payable.*—Second: Incur such expenses and *take such steps as in his judgment may be necessary to maintain the value or to protect or conserve the property* hereby mortgaged.—Third: Foreclose this mortgage by taking possession of the property hereby mortgaged to answer for payment of the debt hereby secured, selling the said property in the manner provided in the Personal Property Mortgage Law.—Sixth: The mortgagor shall pay to the mortgagee any expenses in which the mortgagee may incur for the purpose of maintaining the value of, protecting or conserving the property hereby mortgaged, or any expenses incurred in the foreclosure, care, transportation, or sale of the property foreclosed, from the date such expenses are incurred and until payment in full, at the place agreed upon in the promissory note hereby secured, and such expenses shall also be deemed as of this date to be secured by this mortgage." (Italics ours.)

Grande. The mortgage was recorded on December 24, 1952, in the Registry of Personal Property Mortgages of the Registry of Property of San Germán. The conveyance of the vehicle in favor of Vélez Maldonado was recorded on February 12, 1953, in the Motor Vehicles Division of the Public Works Department.

On February 24, 1953, Vélez Maldonado sold to the corporation Hull-Dobbs Co. of Puerto Rico the mortgaged automobile without the consent of the mortgagee Amado Vega. The corporation registered the automobile in its name in the said Motor Vehicles Division. On March 1, 1953, it sold it to Cecilio Montalvo, a resident of Río Piedras. Montalvo caused the conveyance to be recorded in his favor and took physical possession of the vehicle which had been brought to San Juan by Hull-Dobbs Co.

The mortgagee did not give his consent either to its conveyance or to the second sale. It does not appear from the record that the purchasers expressly assumed the payment of the amount of the mortgage credit, nor that the same was part of the price of the respective conveyances. The debt fell due on December 11, 1953, without Hull-Dobbs Co. or Cecilio Montalvo having paid Vélez Maldonado.

On December 31, 1953, mortgagee Amado Vega wrote to the marshal of the District Court, San Germán Part, urging him to take "immediate possession of the described property [the mortgaged vehicle] for the purpose of selling it, as provided by § 14 of Act No. 19, approved June 3, 1927" (Spec. Sess. Laws, p. 490). On that same day the marshal served process on Vélez Maldonado and returned the original thereof, certifying: "That the mortgaged property could not be recovered because it had been sold by defendant Florencio Vélez Maldonado, according to information furnished by him."

On that same date, December 31, 1953, Amado Vega filed in the District Court, San Germán Part, a complaint against Florencio Vélez Maldonado, Hull-Dobbs Co. of Puerto

Rico, and Cecilio Montalvo for "Collection of Mortgage Credit on Personal Property." [2]

The suit was transferred to the San Juan Part of the District Court. Florencio Vélez Maldonado failed to appear and his default was entered. Hull-Dobbs Co. of Puerto Rico and Cecilio Montalvo answered jointly the complaint admitting part of the facts alleged therein, denying the others, and setting out several special defenses.[3]

---

[2] After setting forth in the complaint the constitution of the mortgage, it was alleged and prayed as follows:

"3. That the said personal-property mortgage has not been cancelled, and that the condition secured thereby has not been performed by the payment of the obligation above described despite the steps taken by the plaintiff, and that 10 days having elapsed since the nonperformance of such obligation, the plaintiff filed legal proceedings to obtain payment thereof through the public sale of the mortgaged property, and that it was impossible to obtain payment of such obligation in the aforesaid manner because the mortgagor had disposed of the said property, as we shall presently see.

"4. That on February 24, 1953, codefendant Hull-Dobbs Co. of Puerto Rico, notwithstanding the fact that it had knowledge of such mortgage by its recordation in the Registry, acquired the mortgaged property by purchase from defendant Florencio Vélez Maldonado; and that on March 1, 1953, codefendant Cecilio Montalvo, who had knowledge of such mortgage through the same means, acquired the mortgaged property in question by purchase from codefendant Hull-Dobbs Co. of Puerto Rico.

"5. That the value of the mortgaged property at the time of purchase by codefendant Hull-Dobbs Co. of Puerto Rico was $1,800, and that none of the defendants has paid such value in whole or in part notwithstanding the steps taken by the plaintiff.

"WHEREFORE, the plaintiff prays the Hon. Court to grant this complaint and *to order the defendants to pay solidarily to the plaintiff the sum of $1,800* and the costs of this suit, including attorney's fees." (Italics ours.)

[3] The last two defenses read as follows:

"2. They allege, further, that before a cause of action arises in favor of the plaintiff and against the defendants herein, it is necessary for the plaintiff to exhaust all resources in order to collect his mortgage and that the steps taken by him in connection therewith be unsuccessful, so that a cause of action may arise in his favor and against the defendants herein.

"3. *That the defendants herein have recovered the mortgaged personal property in favor of the plaintiff, as alleged, and are hereby willing to deliver the same to the plaintiff for foreclosure of his mortgage,* provided he shows that he is the owner of a valid mortgage on such property and on condition that the defendants herein be relieved from the present suit." (Italics ours.)

The trial was held. The district court rendered judgment dismissing the complaint against Hull-Dobbs Co. and Cecilio Montalvo and sustaining the same as to Florencio Vélez Maldonado.[4]

Plaintiff appealed to the Superior Court, San Juan Part, assigning as sole error the failure of the district court to apply "to the facts of the case the provisions of the Mortgage Law dealing with personal property."

On July 10, 1956, the Superior Court held that the error assigned had been committed, and rendered judgment reversing the judgment of the district court insofar as it relieved Hull-Dobbs Co. and Cecilio Montalvo from liability, and sustained the complaint ordering these two defendants to pay to the plaintiff the sum of $900 for "damages" and $350 for attorney's fees and costs. Thereafter it denied reconsideration.[5]

---

[4] Regarding the liability of the first two defendants, the district court stated as follows:

"In order that there may exist the conversion binding the purchaser to pay to the mortgagee the value of the property at the time of transfer, it is necessary that the purchaser, by an act of his, jeopardize or destroy the lien in such a way as to make the creditor lose control of the mortgaged property. In the case at bar, the defendants, on the contrary, have promised to deliver to the plaintiff the mortgaged property so that he may foreclose his mortgage and collect his credit; hence, the defendants have not performed any act of such nature and, therefore, the complaint should be dismissed as to defendants Hull-Dobbs Co. of Puerto Rico and Cecilio Montalvo."

Although in its conclusions the district court determined the amounts which Vélez Maldonado owed the plaintiff, yet, in rendering its judgment following its conclusions, with respect to him it only decreed: ". . . and sustained as to defendant Florencio Vélez Maldonado."

Final judgments are frequently prepared and rendered following the findings of fact and conclusions of law. This practice should be discontinued. Every final judgment should be prepared and rendered separately. This facilitates its entry and execution, the issuance of copies, and the amendments and corrections both to the findings of fact and conclusions of law and to the judgment itself. See Rules 43.1, 43.2, 44.2, and 46 of the Rules of Civil Procedure. 32 L.P.R.A. Cum. Supp. 1958, App.

[5] The Superior Court stated in part as follows:

"The damages sustained by the plaintiff were unquestionably the result of the actions of the defendant Hull-Dobbs Co., first, in acquiring the personal property which was subject to a mortgage according to the

At the request of Hull-Dobbs Co. of Puerto Rico and Cecilio Montalvo we issued a writ of certiorari to review the judgment of the Superior Court.

Petitioners maintain that the respondent court committed error (a) in holding that there was a conversion of mortgaged personal property which prevented plaintiff from foreclosing his mortgage at maturity, and (b) in reversing the judgment of the District Court on the ground that the action filed by the plaintiff was an action for damages.

The Superior Court committed the first error assigned. There was no conversion of the mortgaged automobile nor did the petitioners prevent the mortgagee from foreclosing his security.

## I

Among the different actions which the Anglo-American property law recognizes to the owner of an object is that of trover or trover and conversion. Such action lies for the purpose of claiming damages caused by any person who unlawfully deprives another person of the possession or use of personal property which the moving party may have

---

Registry of Property, and, second, in conveying the same to a third person, in this case, Cecilio Maldonado [sic].

"The plaintiff was diligent in procuring the foreclosure of the mortgage, as provided by law. His inability to foreclose the same was due to the fact that the automobile had been conveyed to Hull-Dobbs Co. The plaintiff advised the defendant in due time that the automobile which it had acquired was burdened by a mortgage. If the defendant wanted to escape liability to the plaintiff, it should have made a tender of judgment equal to the value of the automobile at the time of conversion.

"The rule is that under the Personal Property Mortgage Law, the mortgagee becomes the owner of the property in the sense that he has the legal title, the mortgagor having the right to retain possession, to have the beneficial use, and to defeat the title of the mortgagee by compliance with the terms of the mortgage. In a sense, the mortgagee is the legal owner, the mortgagor the equitable owner. This was the interpretation placed by our highest court in *United Porto Rican Bank* v. *González*, 46 P.R.R. 755, 760, citing the case of *Bachrach* v. *Mantel*, 25 Phil. Rep. 410.

"In order to secure that right which the law grants to the mortgagee, as already stated, § 10 expressly forbids the sale, pledge, etc., of property subject to personal-property mortgage."

in his possession in the capacity of owner or of simple possessor. Its purpose is not to recover the possession of the property or to revendicate it, but to compel the wrongful occupant to pay its full value, even if he is willing to return it. The gist of the legal aspect of the conversion is not the simple acquisition of another's property, but the malicious and wrongful privation of the ownership rights, the illegal exercise, or the assumption of authority over another's property thereby depriving the lawful owner or possessor, permanently or for an indefinite period, of its use and enjoyment.[6]

In the ambit of American conversion, the mere sale or conveyance of mortgaged personal property has different effects, depending on the legislative or jurisprudential tendencies of the mortgage system of the different states of the

---

[6] This action originally lay whenever a person lost a personal property belonging to him and it was found by another person, who, upon demand by the owner, refused to return it, unduly "converting" the same to his own use. Since the original act of finding the object was not an unlawful act, the basis of the action consisted in the undue withholding of the object belonging to another, and, since the defendant unduly appropriated it after demand by the owner for its restitution, by means of this action he was compelled to pay the value of the object withheld against the owner's will, which was tantamount to converting him into a forced purchaser. Oscar Rabassa, *El Derecho Angloamericano* 146 (Mexico 1944).

The word *conversion* has a different connotation in our law. It is the transformation of an act which, being void insofar as it involves a particular legal transaction, is considered valid if it contains all the essential and formal elements of another type of business. The substitution of a void transaction by a valid one flows from the tendency of the law to deny the nullity and not to render invalid juridical acts, whenever possible, in consideration of the declaration of intention and the merits and the substance of the act. Cases of conversion are found in §§ 665 and 1176 of our Civil Code. The phenomenon of conversion is warranted, among other principles, by § 1210 of that Code, whereby the contract binds not only to the performance of the conditions expressly set forth therein but also to all the consequences which, by their nature, are conformable to the good faith, the use, and the law. See 1–2 Clemente de Diego, *Instituciones de Derecho Civil Español, Común y Foral* 694 (9th ed. 1955, Madrid); Luis Riera Aísa, *Conversión del Negocio Jurídico*, article published in V *Nueva Enciclopedia Jurídica Española* 713–18; P. Oertman, *Invalidez e Ineficacia de los Negocios Jurídicos*, published in XVI *Revista de Derecho Privado* 65–80 (1929).

Union. In the group of states which, following the English common-law doctrine, adhere to the theory that the chattel mortgage is an absolute sale of the mortgaged object in favor of the mortgagee, the title in the property passing to the latter, and that the mortgagor only retains a right of redemption—title theory states—and in those which consider it as such as soon as the mortgagor defaults the payment of the loan—intermediate theory states—the sale, not consented to by the mortgagee or which is surreptitious, made by the mortgagor in favor of a third party, is considered void as constituting an unlawful appropriation of the former's property. The group of states which, following the equitable theory, has adopted the doctrine that the mortgage only creates a real right of security (lien) over the mortgaged object, with exclusion of any purpose of conveyance of property or possession in favor of the creditor, and which considers the recording of a mortgage equivalent to the material possession of the mortgaged object—*lien theory states*—recognizes complete freedom to the mortgagor to sell the burdened personal property to a third person, who receives the same subject to the recorded mortgage and only accepts that conversion exists whenever the acquirer, maliciously or fraudulently, to the prejudice of the rights and interests of the creditor, conceals the burdened object, destroys it, deteriorates it, or causes serious damages, alters substantially its nature, mixes it with others in order to bar identification, removes or conveys the same outside the reach of the creditor, or performs intentionally any other act to obstruct the defense, conservation, or effectiveness of the credit and its security.[7]

Notwithstanding the fact that several states of the first group still adhere to the title-conveyance theory, there is

---

[7] 2 Jones, *Chattel Mortgages and Conditional Sales* 3–5 (Bowers ed.); Osborne, *The Law of Mortgages* 31, 32; 2 Glen, Mortgages 1131; Puig Brutau, *Estudios de Derecho Comparado* 96; II Muñoz Morales, *Lecciones de Derecho Hipotecario* 334–36.

observed, particularly in the western states—Cf. *Edge* v. *Smith*, 284 P. 2d 711 (1955), 53 A.L.R. 2d 929, 933—an increasing tendency to regard the chattel mortgage as a guaranty or security to the creditor. The fiction of title conveyance vanishes with the enactment of statutes providing other safeguards to secure the effectiveness of mortgages.

In the early decisions of the State of California there prevailed the theory of title conveyance and possession in favor of the mortgagee.[8] However, as of their codification it rejected such theory and adopted the lien theory through legislation. In §§ 2872, 2877, 2888, and 2889 of its Civil Code of 1872, the mortgage was characterized as a contract of guarantee or security; it provided that, notwithstanding an agreement to the contrary, a lien or a contract for a lien transfers no title to the property subject to the lien, and prohibited the right of redemption. Its subsequent decisions have invariably maintained that the mortgage "is a mere lien or security for the payment of money, and does not convey any title to the mortgagee."[9]

As pointed out, the Superior Court held that a conversion of the property took place when Hull-Dobbs Co. purchased from Florencio Vélez Maldonado the automobile mortgaged, and that "the damages sustained by the plaintiff were undoubtedly caused by the actions of the defendant Hull-Dobbs

---

[8] *Hackett* v. *Manlove*, 14 Cal. 85; *Fogarty* v. *Sawyer*, 17 Cal. 589; *Wilson* v. *Brannan*, 27 Cal. 258; *Woods* v. *Bugbey*, 29 Cal. 466; *Polhemus* v. *Trainer*, 30 Cal. 685; *Heyland* v. *Badger*, 35 Cal. 404; *Wright* v. *Ross*, 36 Cal. 414.

[9] *Harp* v. *Calahan*, 46 Cal. 222 (1873); *Breedlove* v. *Norwich Union Fire Ins. Soc.*, 124 Cal. 164 (1899); *Summerville* v. *Stockton Milling Co.*, 142 Cal. 529 (1904); *Booker* v. *Castillo*, 154 Cal. 672 (1908); *Flores* v. *Stone*, 21 Cal. App. 105 (1913); *Chapman* v. *Hicks*, 41 Cal. App. 158 (1919); *Johnson* v. *Razey*, 181 Cal. 342 (1919); *Diggs* v. *Pacific Gas & Electric Co.*, 57 Cal. App. 57 (1922); *Pacific Finance Corp.* v. *Hendley*, 119 Cal. App. 697 (1932); *Chapman* v. *Great Western Gypsum Co.*, 216 Cal. 420 (1932); *Jolly* v. *Thornton*, 40 Cal. App. 2d Supp. 819 (1940); *Heuer* v. *Truck Ins. Exchange*, 51 Cal. App. 2d 497 (1942); *Priddel* v. *Shankie*, 69 Cal. App. 2d 319 (1945). See 10 Cal. Jur. 2d, *Chattel Mortgages*, §§ 42–47.

Co., first, in acquiring the personal property which was subject to a mortgage according to the Registry of Property, and, second, in conveying the same to a third person." It based its decision on that portion of our opinion in the case of *United Porto Rican Bank* v. *González*, 46 P.R.R. 755, 760 (1934), which reads as follows:

". . . Otherwise, *taking into account the history of chattel mortgages*, we would have been obliged to decide that the attachment could not even have been executed. See Jones, 'Chattel Mortgages' (5th ed.), pp. 1, 2, 752, and 753; see also the holding of the Philippine Supreme Court in *Bachrach* v. *Mantel*, 25 Phil. Rep. 410, thus:

'*Under the Chattel Mortgage Law* the mortgagee becomes the owner of the property in the sense that he has the legal title, the mortgagor having the right to retain possession, to have the beneficial use, and to defeat the title of the mortgagee by compliance with the terms of the mortgage. In a sense, the mortgagee is the legal, the mortgagor the equitable owner.' " (Italics ours.)

According to what we stated in that case, it can not be affirmed that we adopted at that time the title theory of the American law. We simply made reference to "the history of chattel mortgages" within that law and to the holdings in the Philippine decisions "under the Chattel Mortgage Law" in force in the Philippine Islands as of August 1, 1906.[10]

---

[10] The Chattel Mortgage Law of the Philippine Islands is also of American origin. It was passed on July 2, 1906, and took effect thirty days thereafter. It contains several provisions analogous to our 1927 statute on the matter. However, in part of its precepts it transplanted to the archipelago the title theory. Its § 3 provides:

"A chattel mortgage *is a conditional sale of personal property* as security for the payment of a debt or the performance of some other obligation specified therein, the condition being that *the sale* shall be void upon the *seller paying to the purchaser* a sum of money or doing some other act named. If the condition is performed according to its terms *the mortgage and sale* immediately become void, and the mortgagee is thereby divested *of his title*." (Italics ours.)

In the form of chattel mortgage provided in its § 5 it is said:

"That the said mortgagor hereby *conveys* and mortgages to the said

Our Personal Property Mortgage Law, Act No. 19, approved June 3, 1927, objected, and still does, to the adoption. It is inspired in our traditional conception of the nature of the contracts of pledge and mortgage, that is, that, fundamentally, they are but accessory contracts whereby a lien is created on certain property for the security and guarantee of one's own or another's obligation, without conveying to the creditor any dominion title therein. Section 3—according to its original text of 1927 as well as to the present text after the amendment introduced by Act No. 57 of June 10, 1955 (Sess. Laws, p. 206), which introduced in the statute the denomination of "personal property mortgage"—defines mortgage as a lien "to secure the performance of any obligation." In the model form of a mortgage the parties declare that the lien is constituted in favor of the creditor to secure such and such obligation, and the mortgagor asserts under oath "that the foregoing mortgage is made for the purpose of securing the obligations specified therein and for no other purpose. . . ."

Yet, in the case of *Araújo* v. *Arenas*, on reconsideration, 60 P.R.R. 277, 293 (1942), we departed from the letter and spirit of our statute on the matter, from the principles con-

mortgagee all of the following described personal property. . . ." (Italics ours.)

Construing those provisions, the Supreme Court of the Philippine Islands held in *Meyers* v. *Thein*, 15 Phil. Rep. 303, *Rosales* v. *Reyes*, 25 Phil. Rep. 495, *Bachrach* v. *Mantel*, 25 Phil. Rep. 410, and *Mahoney* v. *Tuason*, 39 Phil. Rep. 952, that by operation of the Chattel Mortgage Law the actual contract of pledge of the Philippine Civil Code degenerates into one of sale by mutual consent, with *pacto de retro*, so that, so long as the mortgage exists, the dominion with respect to the mortgaged personal property rests with the creditor-pledgee from the time of the inscription of the mortgage in the registry, and the property ceases to be the property of the debtor for the reason that it has become the property of the creditor, in like manner as the dominion of a thing sold is transferred to the purchaser and ceases to belong to the vendor from the moment of the delivery thereof, as a result of the sale.

In the *Bachrach* case *supra*, applying those principles together with other reasons, the mortgagee was ordered to pay the value of the repairs made on certain mortgaged automobiles.

secrated in our mortgage system, from the well-established interpretation of the California decisions on the nature of the chattel mortgage, and, relying precariously on the historical reference which we made in the case of *United Porto Rican Bank* v. *González, supra,* and the ruling of the Supreme Court of the Philippine Islands in the *Bachrach* case, we adopted without any reservation whatever the title theory of the Anglo-American common law, saying:

"The requisite of a prior deposit *is in harmony with the intrinsic nature of a chattel mortgage, under which the mortgagee becomes to a certain extent the owner of the mortgaged property.* In this connection, citation was made in *United Porto Rican Bank* v. *González, supra,* of the following excerpt taken from the case of *Bachrach* v. *Mantel,* 25 Phil. Rep. 410, decided by the Philippine Supreme Court:

" 'Under the Chattel Mortgage Law the mortgagee becomes the owner of the property in the sense that he has the legal title, the mortgagor having the right to retain possession, to have the beneficial use, and to defeat the title of the mortgagee by compliance with the terms of the mortgage. In a sense, the mortgagee is the legal, the mortgagor the equitable owner.'

"Since the mortgagee, Arenas, held *the legal title to the automobile,* Francisco acquired no legal title to the same which he in turn might transfer to other persons, he having failed to deposit the amount of the mortgage." (Italics ours.)

Several years later professor Luis Muñoz Morales, commenting on the text of that law and the ruling in the *Araújo* case in his treatise *Lecciones de Derecho Hipotecario,* Vol. II, p. 338, stated as follows:

"Consequently, and in accordance with its text, we maintain that, according to this law, ownership title in the mortgaged properties *is not transferred to the creditor,* and the properties remain in possession of the debtor as stated in the model form provided by § 5, and only a lien is created.

"On the other hand, the Civil Code of California in its § 2872 defines lien as follows: 'A lien is a charge imposed in some mode . . . upon specific property by which it is made security for the performance of an act'; and referring further

in § 2888 to its effects, it says: 'Notwithstanding an agreement to the contrary, a lien, or a contract for a lien, transfers no title to the property subject to the lien.'

"In short, that lien, according to the legal technique, is but a limitation of the property right and not a dismemberment or transfer of such right; it is merely a preference as respects any other claim or debt sought to be enforced on the burdened property, provided such mortgage is duly recorded, and this is expressly recognized by the Civil Code of California in its § § 2968 to 2970. For this reason, with all due respect, we believe that the holding of our Supreme Court in the case of *Araújo* v. *Arenas*, 60 P.R.R. 277, decided on April 11, 1942, does not seem to us quite correct, since it says that in personal-property mortgages the mortgagees are the legal owners thereof, the mortgagors being the equitable owners."

In view of the foregoing reasons, and as to the question herein involved, the cases of *United Porto Rican Bank* v. *González*, 46 P.R.R. 755, and *Araújo* v. *Arenas*, 60 P.R.R. 277, are hereby overruled. Although judicial surgery for the extirpation of erroneous precedents should be performed with caution, we believe that both cases, as respects the application in Puerto Rico of the title-conveyance theory, should not subsist. *Cf. Pueblo* v. *Torres*, 80 P.R.R. 238, 239 (1958).

■ Is the sale of the mortgaged automobile which the mortgagor made to Hull-Dobbs Co. as well as the sale that the latter in turn made to Cecilio Montalvo void because it was not consented to by the mortgagee? The only obstacle standing on the way of a negative reply is § 10 of Act No. 19, which provides that "A mortgagor of personal property shall not sell . . . property mortgaged by him . . . without the written consent of the mortgagee." This obstacle is not unsurmountable. That precept and the penalty imposed by the law on the mortgagor for a violation thereof has no other purpose than to protect the mortgagee and avoid the intervention of third parties in the credit relation to whom the conservation, care, and maintenance of the value of the per-

sonal property mortgaged would not matter. Under those conditions the law does not consider the sale void. The mortgage, once it is recorded, is valid against all persons. We have said that its registration is notice of the existing lien to all persons, whether or not they reside in the district where the debtor resides.[11] No one may allege ignorance of the content of the record. The prohibition to the debtor to sell may affect the legality of the transfer but not its validity.[12]

The personal-property security is not divested of its recuperatory right merely because the burdened object passes to a third person. According to § 14 of the Act, the creditor may, after the principal obligation becomes due and unpaid, cause the property to be seized by the marshal of the district "where the property is situated," who may sell the same at

---

[11] *Araújo* v. *Arenas, supra; United Porto Rican Bank* v. *González, supra; United Porto Rican Bank* v. *Ruiz,* 43 P.R.R. 506 (1932). 10 Am. Jur. *Chattel Mortgages,* § 191; 10 Cal. Jur. 2d *Chattel Mortgages,* § 36.

[12] In California it has been held that the violation by the mortgagor of the penal statute prohibiting the sale does not prevent the mortgaged property from passing to the purchaser subject to or free of the lien, according to the circumstances of the case. *Reno* v. *Boyden Co.,* 115 Cal. App. 697, 2 P.2d 214; *Schwartzler* v. *Lemas,* 11 Cal. App. 2d 442, 53 P. 2d 1039. The general rule in that state is that the debtor may sell it subject to the lien. 10 Cal. Jur. 2d *Chattel Mortgages,* § 64.

In the essay of personal-property mortgage published by the Spanish jurist Juan Vallet de Goytisolo in XXXVII *Revista de Derecho Privado* 539 540 (1953), it is said:

"For that reason we believe that, except as otherwise provided, the transfer, without the creditor's authorization, of the property subject to a personal-property mortgage or pledge, without displacement, should be forbidden.

"However, those prohibitions should only affect the legality of the transfer but not its validity. They may give rise to personal, civil, and criminal liability of the transferor and bring about the maturity of the credit, without, however, invalidating the transfer.

"There are strong reasons underlying this view.

"In the mortgage, the burdened object shall remain so regardless of who the owner or possessor is. In the pledge without displacement, the commercial needs require a different solution provided the acquirer has acted in good faith. In the former, it is not therefore necessary to invalidate the transfer; in the latter, it can not be held to be void without affecting the general interest attached to the due protection of the legal personal-property circulation."

public auction notifying the debtor "or the person in possession or in charge of the property." [13]

We have recognized time and again the validity and efficacy of the subsequent sales and mortgages of movable goods and chattels made or constituted by conditional vendees before paying in full the price of their conditional acquisition, notwithstanding the reservation of the title which Act No. 61 of 1916 (Sess. Laws, p. 123) authorizes in favor of the conditional vendor until such time as such property is fully paid, the subsequent sales or mortgages being subject to the

---

[13] Notwithstanding those provisions, Act No. 19 of 1927, which created such an important instrument of modern credit as the personal-property mortgage, suffers many inaccuracies, improprieties, and technical defects. It seems that its creation was not approached with an ample vision of the civil, mortgage, and commercial problems relating to its legal nature, to the security of the credit, and to the juridical traffic. Two months after its enactment, Mr. Muñoz Morales, then Chairman of the Code Commission, submitted to the Legislature an interesting report on this statute, in which he stated, in part, as follows:

". . . and it seems to us that this new statute, as worded, does not come to fill any need for facilitating the credit, but, on the contrary, it will perhaps cause difficulties in practice because of the deficiencies which, to our way of thinking, its precepts contain."

In that report he raised thirty-one questions "which arise from the application of the law," among which is the constitutionality of the procedure for collection of the mortgage, his opinion being that it does not grant the mortgagor a day in court, and that the action is not taken under any judicial authority. He ended the same with the following paragraph: "Our opinion is definitively, with all due respect to the Legislative Assembly, that this Act, far from facilitating the credit, might bring about complications and difficulties in its application."

Evidence that it has, is found in the following cases: *Garcia* v. *Registrar*, 70 P.R.R. 55 (1949); *López* v. *Registrar*, 66 P.R.R. 163 (1946), *Alvarez* v. *Registrar*, 64 P.R.R. 39 (1944), and *Arroyo* v. *Registrar*, 57 P.R.R. 178 (1940), in all of which we held that that law does not authorize the constitution of mortgages on personal property to secure notes to the bearer. The amendment introduced in § 10 by Act No. 71 of 1930, which is a protection to the mortgagee, and those introduced in §§ 3 and 5 by Act No. 57 of 1955, whose aim is to protect the mortgagor, have in nowise corrected the original deficiencies of the statute.

In 1941, Spain attempted to regulate the contract of pledge without displacement by adding to the Civil Code §§ 1863 *bis* to 1873 *bis*. This reform did not have in practice the desired development and application. For the purpose of perfecting the personal-property mortgage as an in-

same conditions of the original conditional-sales contract which has been duly recorded.[14]

In the complaint filed by the mortgagee Amado Vega it was not alleged that there was bad faith in the sales which Florencio Vélez made to Hull-Dobbs Co. and by the latter to Cecilio Montalvo. The evidence fails to establish any. Both turned out to be purchasers of a mortgaged automobile. There is nothing in the evidence to show that both or either of them concealed or placed it without the reach of the procedure prescribed by law for the foreclosure of personal-property mortgages, or that they destroyed it, or caused damages, or that they failed to conserve and maintain it as would a good father of family, that they caused it to depreciate for reasons other than its prudent use or mere lapse of time, or that they voluntarily and maliciously impaired the mortgage security which burdened the same. Hull-Dobbs Co. acquired it and sold it long before the due date of the principal obligation secured by the mortgage. Nor was it alleged or established that both purchasers or either of them (a) assumed payment of the mortgage debt, (b) retained out of the purchase price the amount of the indebtedness for delivery to the creditor, or (c) that the amount of the mortgage was part of the purchase price of each sale. Under these circumstances, there never arose any personal liability on their part for the payment of the mortgage credit, not even for the deficiency resulting from the collection of the credit through the special procedure provided by the

strument of credit, on December 16, 1954 a lengthy and elaborate law was passed in Spain entitled "Personal Property Mortgage and Pledge Without Displacement," which in ninety-five sections, masterly worded, regulates those juridical figures in all their aspects. It authorizes therein the constitution of personal-property mortgage as security of titles to the bearer or transferable by endorsement. Cf. Enciclopedia Jurídica Española, App. 1954, pp. 580–92.

[14] National Cash Register Co. v. Berdeguez, 37 P.R.R. 149 (1927); Arenas v. Batalla, 48, P.R.R. 30 (1935); Smallwood v. District Court, 50 P.R.R. 608 (1936); León v. District Court, 52 P.R.R. 861 (1938); Chase National Bank v. Colón, 56 P.R.R. 281, (1940).

Act of 1927, nor an action for damages for the alleged conversion.[15]   When the credit became due, the creditor had two courses to follow: the ordinary personal collection against Florencio Vélez Maldonado, his original debtor, or the foreclosure of the mortgage security against the object encumbered which was then in the possession of Cecilio Montalvo.   If on that date Hull-Dobbs Co. was not the owner or possessor of the mortgaged automobile, and if it had in no way impaired the mortgage security, the mortgagee had no action against it.

The well-established rule in the cases of *United Porto Rican Bank* v. *Ruiz*, 43 P.R.R. 506 (1932), and *United Porto Rican Bank* v. *González*, 46 P.R.R. 755, (1934), is not applicable to the present case, although in both we applied the doctrine of conversion in the light of the concurring specific circumstances in each of them.   In the former, the plaintiff bank granted a loan to a certain person who secured its payment by mortgage on eighteen oxen, the mortgage being recorded.   The debtor sold sixteen out of the eighteen

---

[15] The assumption of a debt must be expressly agreed upon.   Secs. 1158 and 1162, Civil Code; *Soto* v. *Feliciano*, 80 P.R.R. 595, 598 (1958); *Treuer* v. *Holtzman*, 262 N.W. 369 (Mich. 1935); 100 A.L.R. 1036, annotation in pp. 1038-44; 2 Jones, *op. cit. supra* at 263, § 489, and 1956 Supp. at 91, § 490a.

As a general rule, contracts shall only be valid between the parties who execute them and their heirs—§ 1209 of the Civil Code.   Both Hull-Dobbs Co. and Cecilio Montalvo became owners of something encumbered which they could lose as a result of the collection of the mortgage.   To a certain extent, in purchasing voluntarily the automobile, they became obligated to the mortgagee—§ 1787 of the Civil Code.   But neither of them contracted personally the original obligation, nor substituted, for all purposes, the mortgagor as respects the payment of such obligation.   Their liability extends only to the amount of the proceeds of the sale at public auction of the mortgaged property, and any balance not covered by the *sale* can not be collected out of their own property.   *Cf. Successors of Hilario Santos* v. *Morán*, 32 P.R.R. 55 (1923); *Trueba et al.* v. *Rosales & Cía. et al.*, 33 P.R.R. 986, 990 (1925); *Molina* v. *Pascual*, 42 P.R.R. 645, 650 (1931); *Trautmann* v. *Porto Rico Ore Co.*, 46 P.R.R. 750, 752 (1934): *López* v. *Sierra*, 49 P.R.R. 335, 337 (1935); *Torres* v. *Fernández*, 65 P.R.R. 584, 591 (1946); *Cruz* v. *Registrar*, 69 P.R.R. 497 (1949).

oxen to a partnership, which slaughtered the oxen in order to sell them as meat. We held that the acts of the purchaser constituted conversion and that the partnership was bound to pay the value of the oxen slaughtered. In the *González* case a mortgage was constituted on forty-one oxen which were in the municipality of Gurabo, and the mortgage was recorded in the Registry of Property of Caguas; in an action filed by a third party against the mortgagor an attachment was levied on thirty out of the forty-one oxen mortgaged; judgment by default was entered against the defendant; a depositary was appointed for the oxen attached and the transfer of twenty oxen ordered, notwithstanding the objection made by the mortgagee, to the district of San Juan; ten out of the thirty oxen attached perished in San Felipe hurricane while they were in the possession of the depositary; the twenty oxen transferred to San Juan were sold at public auction, in execution of the judgment, without giving notice of the sale to the mortgagee nor stating in the notices of sale that the oxen were attached, the plaintiff appropriating to its own use the entire proceeds of the sale. We held that the plaintiff, in the action of attachment of the oxen, had converted them to its own use by virtue of the attachment and sale, reversed the judgment discharging it from liability to the mortgagee, and ordered it to pay to the latter the value of the thirty oxen attached.

## II

The Superior Court concluded that "the plaintiff was diligent in procuring the foreclosure of the mortgage" and that "his inability to foreclose the same was due to the fact that the automobile had been conveyed to Hull-Dobbs Co." We believe those conclusions are wrong.

The whereabouts of the mortgaged automobile was not unknown to the plaintiff before the foreclosure. Both the transfer made on February 24, 1953 to Hull-Dobbs Co. and that made on March 1, 1953 by the latter in favor of Cecilio

Montalvo had been recorded in the Motor Vehicles Division. The debtor, Vélez Maldonado, two months after the constitution of the mortgage, had informed him that he had sold the car to Hull-Dobbs Co.

The two sales had not made impossible, either as a matter of fact or of law, the recovery of the possession of the mortgaged automobile. Before filing action an offer of delivery was made to him.[16] He rejected the offer and proceeded to foreclose by requiring the marshal of the San Germán Part, to take "immediate possession of the property" without giving any information on the exact place where the mortgaged automobile was found at that time, nor of the transfer of the vehicle made subsequent to the constitution of the lien. Without any officer having previously demanded of Hull-Dobbs Co. or of Cecilio Montalvo the delivery of the possession of the automobile, and on the very day the marshal returned the document of return of unserved process, he

---

[16] At the hearing held in the Superior Court the parties accepted as correct the statement of proved facts of the district court. In its par. 5 it was stated:

"5. That in answer to the complaint in this case and *at the commencement of the trial in open court, the defendants Hull-Dobbs Co. of P. R. and Cecilio Montalvo offered to the plaintiff to deliver the mortgaged property so that he could foreclose the mortgage and collect the amount of his note. The plaintiff rejected the offer and insisted that he had the right to collect from the defendants, solidarily, the value of the mortgaged property at the time it was acquired by Hull-Dobbs Co. of P. R.*" (Italics ours.)

The statement of the case set up by the district court was not objected to by the parties. From that statement we quote the following:

"In the cross-examination he [plaintiff Amado Vega] testified that when the mortgage fell due he went to see the marshal in order to make the demand. He had gone first to see Vélez. That he does not recall how much time elapsed between his visit to Vélez and the demand made to the marshal. *When the demand was made, Vélez had informed him that he had sold the automobile to Hull-Dobbs. When he went to see the marshal for the purpose of making the demand, he already knew that Hull-Dobbs was in the possession of the car. That when Vélez informed him that he had delivered the car to Hull-Dobbs, he went over to Hull-Dobbs and that they denied having the possession of the property, and that it was then that he made the demand.* After the marshal informed

filed an action for damages against the latter demanding payment, not of the amount of the credit, namely, $1,032 and interest thereon, but the sum of $1,800, plus costs and attorney's fees.

Considering the close relation between the two errors assigned by the petitioners and our ruling as to the first, which in our opinion is the principal error, and that its commission entails the annulment of the judgment appealed from, we need not make a determination as to the second assignment of error.

For the reasons stated, the judgment appealed from, rendered on July 10, 1956 by the San Juan Part of the Superior Court, will be set aside and the case is remanded to the lower court to render another judgment consistent with the terms of this opinion.

Mr. Justice Serrano Geyls did not participate herein.

---

him that Vélez did not have the car, he went to see his lawyer. That he knew that Vélez used the car during two months because the latter himself had informed him about it. *That he mortgaged the vehicle and thought no more about it. That he saw the car occasionally for about two months and after that saw it no more. Two months later he saw Vélez again and asked him about the automobile, and that the latter told him that he had sold it to Hull-Dobbs.* . . . That he talked with attorney Ramón Luis Nevares in his office.

"*Luis G. Marín* testified that he has worked for Hull-Dobbs Co. since May 1952, as General Sales Manager. . . . That he knows the De Soto car involved in this suit. . . . That at present [we presume that he referred to May 12, 1955, the date of his testimony given in court] *the vehicle in question is found in Hull-Dobbs Co. on the lot for used cars situated at Stop 23 in Santurce, Puerto Rico.* . . . . . *That Hull-Dobbs is willing at all times to deliver the said vehicle. That when the complaint was filed and the answer formulated, Hull-Dobbs was always willing to deliver the vehicle. When Amado Vega Vega went to see Hull-Dobbs for the purpose of claiming payment of the mortgage, they offered him the automobile.* . . .

"*Ramón L. Nevares* testified that he is an attorney at law and notary public and that he is the legal representative of Hull-Dobbs Co. . . . *That Amado Vega Vega went to see him in his office before the complaint was filed. The witness offered to Mr. Vega, in the name of his client, to procure and deliver the car to him. That Amado Vega said he would let him know, but he did not receive an answer.*" (Italics ours.)